IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**JUDITH D. CASSEL**,

        Plaintiff,

v.

**WARWICK SCHOOL DISTRICT,**

        Defendant.

**COMPLAINT**

Civil Action No.:

JURY TRIAL DEMANDED

Plaintiff, Judith Cassel ("Cassel"), residing at 347 North Broad Street, Town of Lititz, County of Lancaster, State of Pennsylvania, by way of complaint against the Defendant, Warwick School District ("Warwick"), a creature of Pennsylvania statute, with offices located at 301 West Orange Street, Town of Lititz, County of Lancaster, State of Pennsylvania, says:

1. This action is brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, for discrimination in employment by Warwick against Cassel on the basis of her sex.

2. Jurisdiction is conferred on this Court by 42 U.S.C. 2000e-5, and venue is proper pursuant to 42 U.S.C. 2000e-5(f)(3).

3. Warwick is an employer within the meaning of Title VII.

4. At all relevant times, Cassel was an employee of Warwick within the meaning of Title VII.

5. Cassel started coaching for Warwick in the fall of 1996 as the assistant cross-country coach under Matt Sigford.

6. In the spring of 1997, Cassel asked the Warwick Athletic Director, Terry Kauffman, if she could be a volunteer coach for the track and field team. Kauffman approved her and directed her to

seek and obtain the approval of the head coach, Robert Derr, which she did. Upon information and belief, Cassel was the first female track coach in Warwick's history, and she was the only female track coach during all times relevant to this complaint.

7. On the first day of practice, Cassel opened the equipment room to retrieve some hurdles for her athletes, shut the door, and walked down the hallway. Someone yelled at her. Cassel turned around and Blake Bender was coming toward her. Cassel introduced herself, but Bender did not introduce himself or say hello. Instead, he continued yelling at her about not returning the key to the office immediately after closing the door. This incident marked the beginning of constant hostility from Bender toward Cassel.

8. On an almost daily basis, Bender talked down to her, accused her of doing things wrong, snubbed her or ridiculed her in front of athletes and parents. Upon information and belief, Bender was hostile toward Cassel because of her sex and her status as the only female track coach in Warwick.

9. Both Derr and Bender said sexually suggestive things about and to the athletes, particularly the female athletes. This, combined with the sex-based hostility toward Cassel, created a hostile work environment for Cassel.

10. In 1997, Derr suggested that a particular female athlete's back injury was due to her sexual reputation. During a meal with several female athletes at a State meet in 1998 he remarked that he hoped another female athlete wearing a short skirt would drop her fork so that he could look up her skirt. Blake Bender asked one of the male athletes if he "got any last night on your date". The boy responded "no" and Blake Bender made fun of him saying, "why not, I would have". At a District competition in May of 1998, Bender was sitting with all of the coaches and athletes when a young female athlete walked by; he remarked, "If I was younger, I'd get me some of that." Cassel objected,

stating to Bender that she thought the remark was disgusting and she moved from that table to another athletes' table.

11. Upon their return to the school following this event, Derr called Cassel in to talk to her about all of the things she "caused" to go wrong at the District meet. He blamed her for things she had no part in and things that had nothing to do with her; even events for which she was not present were "her fault." Cassel asked him why he thought these things were her fault and he said that that was what Bender had told him. Upon information and belief, Bender fabricated these accusations in retaliation for Cassel's reaction to his inappropriate remark at the event.

12. Derr had missed the meet without telling the administration. Cassel believes that her response to Bender's remark led Derr to fear that she would go to the administration. Therefore, he tried to blame her for whatever went wrong that weekend, regardless of the fact that he was supposed to be in charge.

13. After that incident, Bender received a letter of reprimand in his file. Warwick administration confirmed that particular remark with other coaches that had been at the table.

14. These are just a few examples of the constant inappropriate sexual comments that were made by Bender and Derr. These and other comments led Cassel to speak to Kauffman concerning their conduct. Kauffman's response was "Yes, I know (Bender) is like that. He is the same way in the teacher's lounge." Cassel inferred that this behavior was tolerated by Warwick since they had first hand knowledge of it and did not do anything about it until Cassel reported it.

15. The next winter (1998-1999), both Bender and Derr's hostility toward Cassel escalated.

16. For example, several of the students from cross-country approached Cassel and sought her assistance with a winter running program. Previously, there had been an informal winter track group

that ran with Ed Nixdorf ("Nixdorf"), another assistant track coach. Cassel established with Nixdorf that he was not planning on running with the athletes that winter; and then obtained permission from Kaufmann to do so. After approximately three weeks, Derr telephone Cassel at home and literally yelled at her. Among other things, he said, "How dare you change the track program without my approval;" "Who do you think you are, the head coach?, "What gives you the right", "Why would you think you could do this without asking me", "You're trying to make me look bad", and "I am the authority not you", all in an intimidating tone.

17. During this same tirade, which was well out of proportion to Ms. Cassel's "offense," Derr made the following comments:

(1) That he already had a serious (winter) track program in place. (If he had, neither athletes, administration nor other coaches knew about it.)

(2) That Cassel had attended his winter track meeting the previous year with all the other coaches. (There never was such a meeting.)

(3) That Cassel should have assumed that he was going to have a serious track program. (Although it was not mentioned once during the entire previous spring program or once during the preceding fall.)

(4) That Cassel should have asked him for permission to start a winter track program. Nixdorf, a male, had run with the athletes for years and never once asked Derr for permission.

18. Upon information and belief, this entire screaming phone call was in retaliation for Cassel reporting Derr and Bender to the administration for their inappropriate actions.

19. Cassel spoke with Kauffman the next day regarding this phone conversation. She advised Kauffman that she thought that this kind of treatment was a consequence of her reporting Derr

and Bender. His advice to her was "to be nicer to them and then they wouldn't bother her". Cassel responded that that was unacceptable advice. In addition, Cassel told him that she needed to set an example to the females that she coached and being nicer to someone that is harassing you is an unacceptable response. Cassel wrote a letter to Mr. Cummins ("Cummins"), the principal, documenting the conversation.

20. Cassel continued to run with the runners that wanted her to run with them. Derr scheduled a meeting to discuss the winter track program, notifying Cassel the day before the meeting, which was held at a time that she couldn't make. Derr started his "winter track program" in the beginning of January, showing up once, to inform the attendees that Ms. Cassel wasn't in charge, Bender was.

21. Bender's hostility toward Cassel escalated. He did not tell her anything about the scheduling of track meets. At track meets Cassel would ask him a question in front of parents and athletes and he would either not answer or say something like "find out for yourself".

22. In the middle of February 1999, an athlete that Bender coached asked Cassel for assistance in contacting the coaches at Penn State, where Ms. Cassel had run. The next day Bender approached Cassel and said "How dare you talk to one of my athletes?", "It's a rule that you don't help my athletes", and "How would you like it if I helped one of your runners?" Cassel said that would be fine and that the coaches are there to help the runners. Bender then said, "Stay away from my athletes and call me Coach Bender."

23. Following this incident, the hostility was palpable from both Bender and Derr. They told jokes about the athletes within Cassel's ear shot, whispering the punch line to send a clear signal to her that she couldn't stop their inappropriate comments. Derr's hostility toward Cassel was also manifested

in his retaliation against Cassel's athletes by disciplining them unnecessarily. For example, in the spring of 1999, one of Cassel's hurdlers went to BYU for a college visit. Upon her return, she was reprimanded and made to run three extra miles for every day that she was gone. There were times when Cassel's athletes were left out of meets or races with no explanations. The athletes inferred that it was because Cassel was their coach.

24. After the 1999 season, Cassel was interviewed by Dr. Iovino ("Iovino"), the district superintendent. He interviewed Cassel because parents had approached him about Derr and Bender's inappropriate actions they had witnessed first hand. Cassel confirmed much of what the parents had brought to light and provided Iovino with her information as well (as set forth above). At that time Cassel specifically informed Iovino that she felt harassed by Bender and Derr for originally reporting these things. Iovino did not comment on this feeling.

25. The harassment and hostility from Derr and Bender continued in the 2000 season, making conditions so intolerable for Cassel that she was constructively discharged from the position of Assistant Track Coach.

26. In the autumn of 2000, Warwick sought to hire a Head Track Coach.

27. Three persons applied for the position: Cassel, Bender and another unidentified male.

28. In or about February 2001, Warwick hired Bender for the position, despite the history of his inappropriate behavior.

29. Warwick wrongfully and discriminatorily rejected Cassel because: (1) It was retaliating against her for objecting to the hostile work environment created by Bender and Derr, which Warwick failed to remediate and thereby implicitly endorsed; and (2) Of her gender, despite the fact that her

qualifications were superior to Bender's. In this regard, it is noteworthy that, upon information and belief, Warwick has never hired a female as a Head Coach of anything but cheerleading.

30. In sum, Cassel was harassed on the basis of her gender, harassed in retaliation for objecting to the inappropriate behavior of the coaches, constructively discharged as a consequence of the continued hostile work environment, and retaliated and/or discriminated against in the selection of Mr. Bender as head track coach; all of which are in violation of Title VII.

31. The foregoing actions caused Cassel damage, including but not limited to lost wages, humiliation, embarrassment and emotional distress.

32. Warwick is liable to Cassel for the damages she has suffered.

33. On March 5, 2001, Cassel attempted to file a Charge of Discrimination with the EEOC in Philadelphia. There was a snowstorm that day, the office was understaffed and planning on closing early, and EEOC employee Mark Maddox advised that the Charge could not be taken that day. When Cassel expressed concern that the date of the filing of the Charge would be delayed, Maddox agreed to accept and file a Charge Questionnaire on that day, and assured Cassel that the subsequent formal Charge of Discrimination would be deemed filed as of March 5, 2001.

34. Cassel was unable to return to the EEOC to file the formal Charge until July 5, 2001, at which time the Charge was filed.

35. Maddox faxed the Charge to counsel for Cassel prior to her signing it. Counsel requested that Maddox check the Continuing Action box on the form and to indicate that the discrimination had begun in the Spring of 1997, and had been continuing since that time. Maddox refused to do so. Despite Maddox's refusal, the discrimination against Cassel has been a continuing violation, with the last discriminatory act occurring with the 300 day period for filing with the EEOC.

36. On April 5, 2002, the Department of Justice issued a Right to Sue letter to Cassel. Cassel has filed this action within ninety (90) days of her receipt of that letter.

WHEREFORE, Cassel demands judgment against Warwick for relief, including, but not limited to:

a. Compensatory and Punitive Damages;

b. Injunctive relief;

c. Attorneys' fees and costs;

d. Pre-judgment and post-judgment interest; and

e. Such other relief as the Court may deem equitable and just.

Plaintiff hereby demands a Trial by Jury.

 

**ROBERT J. HAGERTY**
**Attorney I.D. # 43596**
**CAPEHART & SCATCHARD, PA**
*Attorney for Plaintiff*
Office and Post Office Address
8000 Midlantic Drive
Suite 300
Mount Laurel, New Jersey 08054-1518
(856) 914-2076